BERNARD LEON GOLDENBERG, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Goldenberg v. Commissioner
Docket No. 13262-78.
United States Tax Court
T.C. Memo 1981-589; 1981 Tax Ct. Memo LEXIS 156; 42 T.C.M. (CCH) 1397; T.C.M. (RIA) 81589; October 8, 1981. Bernard Leon Goldenberg, pro se. Bernard S. Mark, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined a deficiency in petitioner's Federal income tax and additions to tax pursuant to section 6653(b) [1] as follows: *157 Taxable Year
Deficiency
Addition to tax (sec. 6653(b))
1968
$ 400,046
$ 200,023
The issues for decision are: (1) whether petitioner understated his taxable income for 1968 in the amount of $ 518,414 with respect to certain stock dealings; (2) whether petitioner properly reported gains and losses from sales or exchanges of certain property on his joint income tax return for 1968; (3) whether petitioner is entitled to a deduction for various business expenses for 1968 in excess of amounts allowed by respondent; and (4) whether petitioner is liable for an addition to tax for fraud pursuant to section 6653(b) for 1968. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner resided in New York, New York, at the time the petition herein was filed. He and his wife, Bridgette Goldenberg, timely filed their 1968 joint Federal income tax return with the appropriate office of the Internal Revenue Service. [2]
During the mid-1960's petitioner was a merger and acquisition specialist employed by First Standard Corporation (hereinafter First Standard), of which *158 he was also a shareholder. First Standard was a publicly held corporate shell which engaged in no business. Its only assets were cash and a patent for a prototype video tape machine. In 1967 petitioner arranged a merger of First Standard and Mastercraft Electronics Corporation (hereinafter Old Mastercraft), which was engaged in the business of importing consumer electronic products and possessed the wherewithal to manufacture and distribute First Standard's video tape recorder. H. John Gluskin (hereinafter Gluskin) was secretary of Old Mastercraft and its "house counsel." Pursuant to the merger, which was completed in December 1967, First Standard acquired all of the assets of Old Mastercraft in exchange for 4,200,000 shares of the former's stock. First standard then changed its name to Mastercraft Electronics Corporation (hereinafter New Mastercraft). The officers and directors of Old Mastercraft held similar positions at New Mastercraft, and petitioner was regularly employed by the new corporation as a merger and acquisition specialist. During discussions in connection with the merger it was determined that New Mastercraft would need approximately $ 200,000 to finance and *159 market the video tape recorder. Petitioner suggested a plan (hereinafter the Plan) whereby, pursuant to the merger, stock would be distributed to certain individuals as nominees of petitioner, Gluskin and Al Dayon, the president and principal stockholder of New Mastercraft. These shares would then be sold by the nominees to the public without registration under the Federal securities laws. Petitioner arranged, managed and controlled the sales of New Mastercraft stock according to the Plan. Under the Plan the proceeds of these sales of stock were to be divided as follows: $ 2 per share to New Mastercraft; 33 percent of the net amount realized to petitioner; and the balance to Gluskin. Gluskin secured an opinion letter from Simeon Brinberg, an attorney, which stated that the stock issued to the nominees was salable without registration. New Mastercraft stock was issued to the nominees and pursuant to the Plan they endorsed the stock certificates in blank, had their names guaranteed by their respective banks, signed blank stock powers and returned the stock certificates to Gluskin. On petitioner's advice Gluskin delivered a certain number of shares to recommended brokers for *160 sale at a particular price. As the nominees received proceeds of the sales of New Mastercraft stock from the brokers they transferred them (less their fee plus an amount sufficient to pay their Federal income taxes) to Gluskin who in turn deposited them in his special account at the Chemical Bank. Said proceeds so received by Gluskin totaled $ 1,372,785.24. Gluskin refused petitioner's request to receive his share of the proceeds in cash. Thus, a scheme was agreed upon whereby a corporation called Superior Plans, Inc. (hereinafter Superior), was formed on March 7, 1968, with petitioner as its sole shareholder. Gluskin was to issue checks to Superior in the amount due petitioner, receiving in exchange convertible debentures of Superior. Gluskin, in fact, did not intend to invest in Superior. The scheme was merely devised as a method to transfer petitioner's percentage of the proceeds derived from New Mastercraft stock sales to him. Gluskin agreed to exercise his right to convert the debentures to stock of Superior so that the corporation would not have to repay the alleged loan. On March 7, 1968 and June 5, 1968, petitioner opened checking accounts for Superior, naming *161 himself as the only person authorized to sign checks with respect thereto. Between March 8, 1968 and September 5, 1968, Gluskin transferred 23 checks payable to Superior in the aggregate amount of $ 540,000. In exchange Gluskin received $ 250,000 in Superior debentures. He also provided petitioner with an undated letter electing to convert all of his debentures to stock. Gluskin never received either interest on the debentures or stock certificates after conversion. Superior did not conduct any business activity during 1968, and its tax returns for 1968, 1969, and 1970 did not disclose loans to it or investments in it. Almost immediately after petitioner deposited Gluskin's checks into the Superior accounts he withdrew the funds: converting $ 407,190 into cash; depositing $ 8,800 into his personal bank accounts; purchasing cashier's checks payable to himself but endorsed over to other individuals in the amount of $ 61,000; and in checks payable to others (including bank charges and checks not located) in the aggregate amount of $ 78,045.51. Petitioner testified that the above funds were, for the most part, invested on behalf of Superior with Arnold Kimmes by handing him cash *162 for the purpose of building a hotel and casino in Las Vegas. At the trial herein petitioner introduced small handwritten scraps of paper which he alleges are receipts for his cash investment with Arnold Kimmes. These represent the only documentary evidence petitioner has ever claimed to have had of this investment. This alleged investment was not reflected as an asset on Superior's 1968, 1969, or 1970 income tax returns. During the examination of petitioner's 1968 tax liability he stated to the examiner that he had borrowed the funds from Superior and then loaned them (individually) to Kimmes. Petitioner testified herein that he is unaware of what happened to these funds, and that he undertook no legal action and made no efforts outside of inquiry to secure their return. On October 6, 1966, petitioner was indicted on three counts of purgery; count one relating to his testimony before the Securities and Exchange Commission, and counts two and three relating to his testimony before the grand jury. On July 14, 1971, petitioner was found guilty as charged in counts one and three of the indictment and convicted. He served a prison sentence with respect to this conviction from *163 November 8, 1971 through February 3, 1972. [3]
On April 14, 1975, petitioner was indicted for willfully attempting to evade his income taxes for the taxable year 1968 in violation of section 7201, and for willfully making and subscribing to a joint U.S. Individual Income Tax Return for the taxable year 1968 which he did not believe to be true and correct as to every material matter, in violation of section 7206(1). Petitioner pleaded not guilty and on April 12, 1976, he was convicted of violating sections 7201 and 7206(1) by a jury after a trial on the merits (U.S. District Court for the Southern District of New York). This conviction was affirmed by the U.S. Court of Appeals for the Second Circuit. On his return for 1968 petitioner reported taxable income of negative $ 3,244. On Schedule D of his return he claimed a bad debt deduction of $ 21,000 and he claimed various business expense deductions on his Schedule *164 C totaling $ 51,286. By his notice of deficiency respondent determined that petitioner realized taxable income of $ 518,414 from his part in the sale of New Mastercraft stock and that he had an additional shortterm capital gain of $ 485 on the sale of Southern Realty Utility Company stock. Further, respondent disallowed the claimed bad debt deduction and $ 51,086 of petitioner's business expenses for lack of substantiation. Finally, respondent determined that all or part of petitioner's underpayment of tax for 1968 was due to fraud. OPINION Petitioner contends that the funds received by Superior represented an investment in that corporation by Gluskin and that these funds were in turn invested on behalf of Superior, in a Las Vegas hotel and casino through Arnold Kimmes. Respondent asserts that the funds transferred to Superior by Gluskin represent petitioner's agreed share of the proceeds derived from the sale of New Mastercraft stock, and that Superior was no more than a sham organized solely as a conduit through which petitioner would receive the money. As to the underpayment of tax, the petitioner bears the burden of proving all of those facts necessary to support the *165 theory upon which he relies. ; Rule 142(a). [4] This, the petitioner has plainly failed to do. Petitioner does not dispute that Superior received $ 540,000 from Gluskin. However, he would have this Court believe that Gluskin, an attorney, invested this money in exchange for only $ 250,000 of Superior's debentures even though that corporation had no assets and no business. Moreover, petitioner maintains that these funds were invested in a Law Vegas hotel through Arnold Kimmes. The petitioner is an educated man, having attended several universities and having studied business administration (including business law and contract law). He told the story that Arnold Kimmes would only deal in cash; that there were no written contracts or other documents evidencing Superior's investment of over one-half million dollars; that Kimmes, his accountant, or his chauffeur would fly into New York to collect up to $ 50,000 at a time in cash; and that these individuals refused to give receipts except *166 upon petitioner's vehement insistence. Petitioner also testified that he was and is unaware of what happened to the money given to Kimmes and states that he never made any serious effort to recover it. Coming from anyone else, petitioner's testimony would be doubtful at best but, given petitioner's conviction for purgery before the Securities and Exchange Commission and the grand jury in 1971, it is entirely incredulous. Moreover, the other evidence presented in the record herein weighs heavily in support of respondent's position. Three officers of New Mastercraft, including Gluskin and Al Dayon, testified as to petitioner's role in the Plan and the scheme, stating that he received percentages of the proceeds from the sale of New Mastercraft stock. Furthermore, notwithstanding petitioner's explanation of how the funds were acquired by Superior (as debt or equity investment and subsequently "invested" with Kimmes) petitioner, as treasurer of Superior, did not report any of these transactions on its 1968, 1969, or 1970 Federal income tax returns which reflected that Superior had no assets and no liabilities. We believe the evidence overwhelmingly establishes that Superior *167 was a mere conduit for the receipt of income earned by petitioner for his part in the promotion and sale of New Mastercraft stock. Thus,we agree with respondent that receipts from these transactions were income to petitioner for 1968. Sec. 61; ; ; cf. . In his notice of deficiency respondent also determined that petitioner underreported his income from capital transactions by $ 485. Further, respondent has disallowed a claimed bad debt deduction of $ 21,000, and various claimed business expenses totaling $ 51,086 on the basis that petitioner has failed to substantiate his entitlement to them. Again, the petitioner bears the burden of proving his claim. Rule 142(a). The record herein is devoid of any credible evidence whatsoever which would tend to rebut the statutory notice with respect to these items. Petitioner's only explanation for the absence of documentation is that with the passage of time and his stay in jail his records have been lost or destroyed. On this record, we hold that petitioner has failed *168 to meet his burden to prove that the respondent's determination is incorrect. The final matter presented herein is whether all or part of petitioner's underpayment of tax in 1968 was due to fraud pursuant to section 6653(b). With respect to fraud the burden of proof is on the respondent and must be met by clear and convincing evidence. ; Rule 142(b). Respondent has chosen to rely entirely upon the doctrine of collateral estoppel to support his determination that the petitioner is liable for the addition to tax for fraud. It is well settled in this Court that once having been convicted of willfully attempting to evade taxes for a given year, pursuant to section 7201, the taxpayer is collaterally estopped to deny that an underpayment of tax for the same year was due to fraud pursuant to section 6653(b). ; . Similarly, we have held that a conviction under section 7206(1) collaterally estops the taxpayer so convicted from denying that he filed a fraudulent Federal income tax return from *169 which was omitted income for the year involved. ; In 1975 petitioner was indicted for violating both sections 7201 and 7206(1) for 1968. He pleaded not guilty to both violations. After a trial on the merits before a jury in 1976 petitioner was convicted of violating sections 7201 and 7206(1). These convictions were affirmed by the U.S. Court of Appeals for the Second Circuit. Thus, in accord with the precedent of this Court, we hold that petitioner is estopped by his convictions in the prior criminal case from denying that his underpayment of tax in 1968 was due to fraud pursuant to section 6653(b). [5]
Accordingly, Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue.↩
2. Bridgette Goldenberg is not a party in the instant litigation.↩
3. On January 21, 1971, petitioner was indicted on 15 counts of unlawfully using the mails to sell unregistered shares of New Mastercraft, and 1 count of conspiracy to do the same. He was subsequently acquitted with respect to each count of this indictment.↩
4. Unless otherwise indicated, any reference to the "Rules" shall be deemed to refer to the Tax Court Rules of Practice and Procedure.↩
5. Notwithstanding the doctrine of collateral estoppel, we note that it is obvious from the facts presented herein that respondent has independently proved by clear, convincing and overwhelming evidence that petitioner's underpayment of tax for 1968 was due to fraud.↩